PALMER (WARREN SAVING BANK v.). See Case No. 17,207

PALMER (WILCOCKS v.). See Case No. 17,638.

PALMER (WYTHE v.). See Case No. 18,120.

PALMER (YOUNG v.). See Case No. 18,-170.

---

## Case No. 10,699.

### The PALMETTO.

[1 Biss. 140.][1]

District Court, N. D. Illinois. Dec., 1856.

COLLISION—VESSEL AT WHARF—PROPER PLACE FOR ANCHOR—CITY ORDINANCES.

1. In a stream as narrow and crowded as the Chicago river, a tow of nine loaded canal boats is, under ordinary circumstances, too heavy for a tug; and although the tow is almost exclusively under the control of the tug, if the latter, being the agent of the boats, is overtasked, the boats must answer for the fault.

2. It is the imperative duty of all craft navigating the river, to avoid coming in contact with vessels moored to the wharf, and in case of collision, the presumption is that the former is in fault, and, if they from carelessness, negligence, or want of skill, collide with a moored vessel, contributory fault of the stationary vessel does not excuse them.

3. A vessel lying at the wharf must have her anchor out of the way of passing vessels. If she allows it to hang at the hawse pipe, with the flukes below the surface of the water, where it sinks a colliding boat, she is in fault. She is also in fault for not dropping it on the approach of a vessel.

[Cited in The B. S. Sheppard, Case No. 2,072; Price v. The Sontag, 40 Fed. 176.]

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

4. Though such a position of the anchor may meet the requirements of the city ordinances, it does not meet the demands of maritime law.

[See The B. S. Sheppard, Case No. 2,072.]

5. City ordinances concerning vessels are binding only as police regulations: beyond this they have no force in the United States courts. This court will allow them to be read, determining for itself their application to the subject matter.

On the 12th of July, 1854, the schooner Palmetto was lying at the claimant's dock, on the west side of the south branch of the Chicago river, with her head up stream. An anchor was suspended from her larboard bow, with its flukes some distance below the surface of the water. It was about six o'clock in the morning; the wind was blowing pretty fresh from the south-east. At that time, and while the Palmetto was in that position, the steam tug Seneca was proceeding down the south branch from Bridgeport, having in tow eight or nine canal boats, two abreast. Among these canal boats was the Rio Grande, in the third tier from the tug, loaded with oats—both boat and cargo the property of the libellant. It was near a bend in the river, and just before they approached the Palmetto, the stern of the Rio Grande struck two mud scows which were lying near the dock, about two hundred feet above the schooner, which caused the bow of the Rio Grande to swing in towards the dock of the Palmetto. The speed of the Seneca was only two or three miles an hour, and it had been slackened as they were rounding the bend in the river. The river was quite full of vessels. With the wind as it was then, and for the Seneca, it was a heavy tow. The helmsman of the Rio Grande saw that he could not, with the helm, prevent the canal boat from coming in contact with the schooner, and an effort was made to keep her off with poles, which, as the mud was there soft, was unavailing, and a collision took place between the Rio Grande and the Palmetto forward, the anchor of the latter knocking a hole in the canal boat, which caused her to sink immediately.

Grant Goodrich, for libellant.
Mr. Hooper, for respondent.

DRUMMOND, District Judge. The Palmetto was lying at her dock in the act of discharging her cargo. There can be no question of her right to be moored there for that purpose. While in that position, it was the imperative duty of all craft navigating the river to avoid coming in contact with her. This is a cardinal rule to be borne in mind in judging of the conduct of the Rio Grande. It is well known that the Chicago river is a narrow stream, requiring great caution on the part of vessels in passing up and down, and it is of primary importance that they should, as near as possible, keep the center of the river. Though there were several vessels at the time in the river, it does not appear that there were any immediately opposite the place where the Palmetto was moored which obstructed the channel. It was at a bend of the river. The tendency of the wind was to drive them toward the western shore. The circumstances and the place demanded unusual circumspection. The tug and its tow should have moved only at such speed as to be under the command of the helm, or if that was impracticable, the speed should have been so checked as to avoid all danger in case of collision. The helmsman of the Rio Grande states that the canal boat struck some scows, which caused her to swing into the Palmetto. I can see nothing in the testimony to excuse or justify this contact with the scows. It is a fair inference that it was the cause of the collision, and it is a circumstance not to be overlooked, that he did not state this material fact till he had already undergone one separate examination. Independent of all this, I am of the opinion that, under the circumstances, the Seneca had too heavy a tow. The witnesses do not all agree about the wind, but the weight of the evidence is, there was a fresh breeze on the river. It is natural for tugs to include as many in tow as possible, but it should be remembered that the tow is almost exclusively under the control of the steamer, and if the latter is overtasked, it is an error which may be attended with the most serious consequences. In this instance the canal-boat was subject to the steamer, but the latter was the agent of the Rio Grande, and the principal must answer for the acts of the agent.

Besides, when a vessel navigating the river, comes in collision with another, properly moored at her wharf, the presumption is that the former is in fault, and that presumption must be overcome by satisfactory evidence. I see nothing in this case to rebut that presumption, but much to confirm and strengthen it. It would be a dangerous doctrine to hold a vessel entirely free from fault and its consequences, which by carelessness, negligence, or want of skill while navigating the river, comes in contact with another moored at the wharf, merely because there might be a fault on the part of the stationary vessel which would produce injury or tend to produce it. It is said if the anchor of the Palmetto had not been where it was, no damage would have been done. It is difficult, perhaps, to decide absolutely what would have been the result if the anchor had not been there, but it may with equal truth be said,—conceding the proposition,—that if the Rio Grande had not come in contact with the Palmetto no injury would have ensued. I feel inclined to judge the conduct of the Rio Grande with rather more strictness than I should if both vessels had been under way in the river. I consider that rule the safest which conduces most to vigilance, to the exercise of skill, to prudence and circumspection; and

on the whole, my conclusion is, on this part of the case, that the Rio Grande was in fault.

The next point to be determined is, whether the Palmetto was in fault.

It has been strenuously urged on the part of the claimant, that the schooner was lawfully at her dock discharging her cargo, and that the collision and its consequences must legitimately fall upon the Rio Grande, by whose unskillful management the accident was caused.

An ordinance of the city has been introduced in evidence which requires a vessel while at the wharf to have her anchor on board, or hanging at the forefoot, and some witnesses were examined touching the precise locality of the forefoot. I do not consider it necessary to dwell upon this branch of the case. We generally allow the ordinances concerning vessels to be read, but determine their application to the subject matter. They are binding only as police regulations: beyond this they have no controlling force upon the courts of the United States, which are governed by the principles and rules of the admiralty law. The New York v. Rea, 18 How. [59 U. S.] 223. It is necessary to inquire therefore, irrespective of the ordinance, whether the anchor of the Palmetto was at the time in a proper place; and I hold clearly it was not. There is some conflict of testimony as to its actual position, but I think the weight of the evidence is, it was hanging at the hawse pipe. When a vessel is navigating the river, the anchor should be in a condition to be let go at a moment's notice, because the safety of the vessel itself, and of others, may depend upon the anchor being speedily dropped. Under such circumstances the anchor, like the helm, is one of the agents of safety. Along side the wharf the anchor is useless. There the vessel's mooring tackle is not fastened to the bottom, as with the anchor, but to the wharf, and the same remark applies here as in the other part of the case. While the vessel in motion must use all needful skill and caution to avoid the vessel at rest, the latter should always have her hamper, as well aloft as below, as much as practicable out of the way of passing vessels. The yards and anchors, and other movable parts of the vessel should be arranged with that object in view. The enforcement of this rule is peculiarly necessary in so narrow a stream as the Chicago river.

I do not think it necessary to decide a question made in the testimony and in the argument, whether the anchor was technically under the forefoot, because I am of the opinion whether it was or not, that it was not at the time properly disposed of. A vessel while lying at the wharf must have her anchor out of the way of passing vessels; it is not, perhaps, indispensable that it should be always on board, but it is certain it must be where it cannot injure vessels navigating the river. There is no other safe rule. If an anchor suspended from the hawse pipe, with its stock even with the surface of the water or just above or below it, meets the requirements of the ordinance, it certainly does not meet the demands of the maritime law.

Whether the collision would have sunk the Rio Grande if no anchor had been there, we do not absolutely know. The libellant's witnesses think not; however this may be, it is clear in such an event, the Rio Grande would not only have had to bear her own loss, but the parties would have been liable for any damage done to the Palmetto; and this I think is one test to determine whether under the circumstances, the Rio Grande was in fault.

In a stream so narrow as the Chicago river, it is manifest that collisions may occur between vessels at the wharf and those in motion, in spite of the utmost skill and care. It is therefore extremely hazardous for the vessel at rest to have her anchor hanging at her bow or elsewhere, as a weapon of offence to crush any passing vessel which by inevitable casualty may come in collision. Any practice, if any exists, which tends to produce such disastrous results cannot be sanctioned by this court.

Taking the case therefore as made by the witnesses of the claimant, the anchor was suspended at the hawse pipe in such a manner as to be liable to injure any craft in motion. This was a fault on the part of the Palmetto; it was also a fault that they did not drop the anchor on the approach of the Rio Grande, of which they had ample notice.

If it clearly appeared the Rio Grande struck the schooner through inevitable accident, as by a sudden and unforeseen flaw of wind, or otherwise, all proper skill and caution being used, I should allow the libellant full indemnity; but as I find both parties in fault. I can only allow partial compensation.

The rule in admiralty, in such cases, is that the loss must be divided. The evidence shows that the oats were a total loss. The canal boat was raised, and repaired. The quantity of oats was six thousand five hundred and sixty-two bushels, which at the market price in Chicago, as proved, is $2,067.03. The repairs of the boat were $439.42. Ten dollars a day are allowed for forty-seven days detention, $470.00. The whole damage therefore, was $2,976.45, one-half of which is $1,488.22, for which last sum a decree will be rendered against the claimant and his surety. Each party will pay his own costs.

NOTE. Where a ship is at anchor in a proper place, colliding vessel liable. Strout v. Foster, 1 How. [42 U. S.] 89.

Even though there was no fault with either vessel. The United States v. Mayor, etc., 5 Mo. 230.

The fault, under almost any circumstances is

with moving vessel. The Granite State, 3 Wall. [70 U. S.] 310.

See, also, The Lochlibo.' 1 Eng. Law & Eq. 651; Culbertson v. Shaw, 18 How. [59 U. S.] 584; The Julia M. Hallock [Case No. 7,579]; The George, 2 W. Rob. Adm. 386; The Massachusetts, 1 W. Rob. Adm. 371; The Victoria, 3 W. Rob. Adm. 49; The Girolamo, 3 Hag. Adm. 169, 173; The Eolides. Id. 367; The B. S. Sheppard [Case No. 2,072].

Presumption against moving boat, and ordinary care will not excuse her. Mills v. The Nathaniel Holmes [Case No. 9,613]; The Bridgeport [Id. 1,861]; The Helen R. Cooper [Id. 6,334]; The Russia [Id. 12,168]; The Leo [Id. 8,250].